IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| THIELE KAOLIN COMPANY; and KAMIN, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 5:10-CV-218 (MTT) |
| BNSF RAILWAY COMPANY, | ) ) | |
| Defendant and Third-Party Plaintiff, | ) ) ) ) | |
| v. | ) ) | |
| UPM-KYMMENE, INC., | ) ) | |
| Third-Party Defendant | ) ) | |

## **ORDER**

This matter is before the Court on the Motion to Dismiss Third-Party Complaint for Lack of Jurisdiction (Doc. 15) (the "Motion") filed by Third-Party Defendant UPM-Kymmene, Inc. ("UPM"). For the following reasons, the Motion is granted.

### I. FACTUAL BACKGROUND

**A. The Parties**

The Plaintiffs, Thiele Kaolin Company and KaMin LLC, are two companies involved in the extraction and transportation of kaolin clay in Georgia. The Plaintiffs maintain a fleet of nearly 1,000 railway cars capable of transporting kaolin clay to their customers. According to the Plaintiffs, the use of these private railway cars by railway companies entitles the Plaintiffs by statute to mileage allowance payments from the railway companies that utilize the cars.

UPM Blandin Paper Company, which is not a party to this litigation, is one of the Plaintiffs' customers. Blandin uses kaolin for the production of coated groundwood paper, which is primarily used in the production of magazines. Blandin has a facility for the production of groundwood paper in Grand Rapids, Minnesota. Blandin, at the time this dispute arose, purchased kaolin from the Plaintiffs F.O.B. Sandersville, the location of the Plaintiffs' facilities,[1] and utilized three railway companies to transport the kaolin to Grand Rapids. Sandersville Railroad Company, a shortline freight railroad, carried the kaolin-laden cars from the Plaintiffs' facilities to Tennille, Georgia. Norfolk Southern Railway Company carried the cars from Tennille to Chicago, Illinois. And BNSF Railway Company, the Defendant and Third-Party Plaintiff in this case, carried the cars from Chicago to Grand Rapids.

Third-Party Defendant UPM is an affiliate of Blandin. UPM and Blandin are owned, along with UPM Raflatac (not involved in this litigation), by UPM-Kymmene Investment Holding Company (also not involved in this litigation). UPM does not purchase, or assist in the purchase of, kaolin.[2] Rather, UPM purchases 100% of Blandin's groundwood paper

---

[1] Under Georgia law, F.O.B.: "Unless otherwise agreed, the term F.O.B. (which means "free on board") at a named place . . . is a delivery term under which[, w]hen the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in this article . . . and bear the expense and risk of putting them into the possession of the carrier. . . ." Here, F.O.B. Sandersville means that the Plaintiffs bore the expense and risk of putting the kaolin in the possession of the carrier in Sandersville.

[2] BNSF contends that UPM was the purchaser of kaolin. Throughout its brief, BNSF makes such statements as, "UPM purchased between 9,000-22,000 dry tons of kaolin clay per year for domestic use at UPM's Grand Rapids, Minnesota production facility," or "UPM spent approximately $5 to $6 million dollars annually to purchase kaolin clay from Georgia between 2005 and 2009." However, this simply was not the case. As UPM's 30(b)(6) witness testified, Blandin, not UPM, was the purchaser of the kaolin, (LaMantia Dep. 2, 8:13-11:15). Moreover, bills of lading attached to another deposition show the purchaser as "UPM-Blandin." (Yates Dep. Exhs. 1-3, Nov. 10, 2010).

output and sells it throughout the country. UPM also provides logistical support to Blandin, such as market analysis. At issue in this case is UPM's role in negotiating freight rates on behalf of Blandin.

UPM, in providing logistical support to Blandin, negotiates freight rates on behalf of, and "with the full knowledge and authority of[, Blandin]" for the transportation of kaolin clay from Sandersville to Grand Rapids. UPM's involvement in shipping, however, is limited to the negotiation of the rates; Blandin arranges the actual transportation details on a car-by-car basis. In other words, UPM negotiates the rates the railway carriers will charge Blandin for a period of time, and Blandin arranges the transportation details for each car.

Prior to June 1, 2008, Blandin paid a "through rate," which is "an agreement that would cover the transportation from origin to destination under one freight bill . . . ." (LaMantia Dep. 1, 39:5-21, Nov. 5, 2010). With a through rate, one bill from Norfolk Southern would include freight rates for its services as well as the services of any other transportation companies, such as shortline rail and BNSF. The through rate is in contrast to the "Rule 11 rate" that UPM negotiated for Blandin beginning June 1, 2008. Under a Rule 11 rate, "[UPM] negotiated separately with the carriers[, such as shortrail, Norfolk Southern, and BNSF,] and negotiated separate freight rates depending on the junction, received freight invoices from the separate carriers, routed the shipments . . ." (LaMantia Dep. 1, 39:22-40:4). A Rule 11 rate allowed UPM and Blandin "to optimize [their] freight costs." (LaMantia Dep. 1, 40:4). Essentially, whereas through rates are negotiated with one carrier and include services provided by other carriers, Rule 11 rates are negotiated with each carrier providing transportation services.

With the rates in place, Blandin would arrange for the transportation of individual cars from Sandersville to Grand Rapids. Blandin would unload the cars at its facility in Grand Rapids and make arrangements to return the cars to the Plaintiffs in Sandersville. UPM was not involved at either of these stages.

**B.   Facts Leading to Litigation**

The specific facts giving rise to this litigation concern the use of the Plaintiffs' private cars by BNSF and an indemnity agreement between BNSF and UPM.

According to the Plaintiffs, under 49 U.S.C. §§ 11121-11122, the use of their private cars by the Sandersville Railroad Company, Norfolk Southern and BNSF entitled the Plaintiffs to mileage reimbursement payments. During a routine audit of their records, the Plaintiffs discovered that BNSF had failed to credit the Plaintiffs fully for mileage allowances the Plaintiffs were statutorily entitled to. The Plaintiffs submitted claims for mileage allowances to BNSF—Thiele for $137,935.08 and KaMin for $262,137.77. BNSF denied the claims.

The Plaintiffs filed this action against BNSF in June 2010. BNSF answered and, in September 2010, filed its Third-Party Complaint against UPM, claiming that, pursuant to an indemnity provision in a purported transportation contract between the two companies, UPM must indemnify BNSF for any charges owed to the Plaintiffs. Under this contract, "[UPM] is the Party responsible for the freight charges." Furthermore, UPM agrees to indemnify BNSF for mileage allowance payments:[3]

---

[3] The significance of the purported transportation contract is a matter of some debate. BNSF argues that the contract represents an agreement between UPM and BNSF according to which BNSF would transport kaolin from Chicago to Grand Rapids and UPM would indemnify BNSF. UPM argues, first, that it is not a transportation contract at all, but rather a rate quote (therefore, the indemnity provision is not binding). UPM

> Shipper[, i.e., UPM,] will, and BNSF will not, be liable for mileage allowances in excess of the above obligation. In the event that a party other than the shipper using these rates submits a claim to railroad[, i.e., BNSF,] for mileage allowance payments in excess of BNSF's obligation under this tariff, shipper shall, at BNSF's option, either (1) release, defend and indemnify BNSF from said claim including attorney's fees and cost of litigation, or (2) reimburse BNSF for excess mileage allowances paid by BNSF within thirty (30) days of notice by BNSF.

Now that BNSF has been sued for mileage allowance payments, BNSF seeks to hold UPM accountable for any judgment against BNSF.

UPM filed this Motion, arguing that the Court must dismiss the Third-Party Complaint because the Court lacks personal jurisdiction over UPM. In essence, UPM argues that it does not have sufficient contacts with Georgia to allow this Court to exercise jurisdiction over it with respect to a contract for transportation between Illinois and Minnesota. The Court agrees.

## II.     DISCUSSION

### A.    Burden of Proof

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010). "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, 'the burden

---

also argues that this contract is not for the transportation of kaolin *to* Grand Rapids, but for the transportation of finished paper *from* Blandin's facilities in Grand Rapids (paper that UPM had purchased and was to sell to its customers). This latter explanation, if true, would certainly clarify one puzzling aspect of the purported transportation contract, that being why UPM would be the party responsible for freight charges if, as UPM alleges, Blandin purchased the clay, paid for the transportation of that clay, and was obligated to pay any freight charges. Nevertheless, the exact character of the purported contract is not important for a resolution of the issues in this case. Therefore, the Court assumes that it is a transportation contract for the transportation of kaolin to Grand Rapids, that UPM is liable for freight charges and that the indemnity provision is enforceable.

traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" *Id.* "'Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.'" *Id.*

**B.  Introduction**

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists:  the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Id.*  While little has changed in recent years in the law regarding due process analysis, the same cannot be said for the interpretation of Georgia's long-arm statute, O.C.G.A. § 9-10-91.[4]  The relevant part of that statute reads:

> A court of this state may exercise personal jurisdiction over any nonresident . . . in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she:
>
> (1)  Transacts any business within this state;
>
> (2)  Commits a tortious act or omission within this state. . .; [or]
>
> (3)  Commits a tortious injury in this state caused by an act or omission outside this state if the tortfeasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state . . . .

In 2005, the Georgia Supreme Court, in *Innovative Clinical & Consulting Services., LLC v. First National Bank of Ames*, 279 Ga. 672, 620 S.E.2d 352 (2005), attempted to bring

---

[4]  Here, only subsection (1) is applicable, but discussion of subsections (2) and (3) is necessary to fully analyze the issues presented.

clarity and consistency to its construction and interpretation of the long-arm statute. At first glance, *Innovative Clinical* seems to streamline subsection (1) analysis:

> Under [a] literal construction, O.C.G.A. § 9-10-91(1) grants Georgia courts the unlimited authority to exercise personal jurisdiction over any nonresident who transacts any business in this State. Of course, because this statutory language would expand the personal jurisdiction of Georgia courts beyond that permitted by constitutional due process, we accordingly construe subsection (1) as reaching only "to the maximum extent permitted by procedural due process."

*Id.* at 675, 620 S.E.2d at 355. However, the Eleventh Circuit, in *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249 (11th Cir. 2010), concluded that subsection (1) analysis is rather more subtle, and complicated, than a cursory reading of *Innovative Clinical* may suggest.

**C.     *Innovative Clinical* and *Diamond Crystal***

In *Innovative Clinical*, the Georgia Supreme Court undertook to reinterpret the Georgia long-arm statute in light of its holding in *Gust v. Flint*, 257 Ga. 129, 356 S.E.2d 513 (1987). Prior to *Gust*, the supreme court had held that there was no essential difference between subsection (2), which allows a court to exercise personal jurisdiction over a nonresident "who commits a tortious act or omission within [the] state . . .," and subsection (3), which allows the exercise of personal jurisdiction over a nonresident who "[c]ommits a tortious injury in this state caused by an act or omission outside this state . . ." as long as certain limitations were observed. *Innovative Clinical*, 279 Ga. at 673, 620 S.E.2d at 354. "Because subsection (2), unlike subsection (3), contained no explicit legislative limiting conditions, [the supreme court] held that subsection (2) was constrained only by, and thus was co-extensive with, the Fourteenth Amendment of the U.S.

Constitution." *Id.* In *Gust*, the supreme court rejected this interpretation of subsection (2), as well as the line of cases applying it, and insisted instead on a "literal construction" of the long-arm statute. *Id.* at 673-74, 620 S.E.2d at 354. "This holding reinstated the difference between subsections (2) and (3) established by the literal language of the statute." *Id.* at 674, 620 S.E.2d at 354. This "literal language" analysis must be applied to all subsections of the Georgia long-arm statute. *See id.* at 674-75, 620 S.E.2d at 355.

Before interpreting subsection (1) in light of *Gust,* the supreme court criticized the Eleventh Circuit's interpretation of the long-arm statute, calling it "erroneous." *Id.* at 674 n.2, 620 S.E.2d at 354 n.2. According to the supreme court, the Eleventh Circuit erred when it relied on a line of cases preceding *Gust*, including *First United Bank of Miss. v. First Nat. Bank of Atlanta*, 255 Ga. 505, 340 S.E.2d 597 (1986), which held that "Georgia's long-arm statute confers in personam jurisdiction to the maximum extent allowed by the due process clause of the U.S. Constitution." *Innovative Clinical*, 279 Ga. at 674 n.2, 620 S.E.2d at 354 n.2. The Eleventh Circuit, according to the Georgia Supreme Court, was relying on superseded precedent.

Returning to the proper interpretation of subsection (1) in light of *Gust's* requirement that a court interpret the statute according to its literal language, the court noted that subsection (1), like subsection (2), has "no explicit limiting conditions. *Id.* at 673-75, 620 S.E.2d at 354-55. Thus, "[n]othing in subsection (1) limits its application to contract cases . . .; nothing in subsection (1) requires the physical presence of the nonresident in Georgia or minimizes the import of a nonresident's intangible contacts with the State." *Id.* "Under [a] literal construction, O.C.G.A. § 9-10-91(1) grants Georgia courts the unlimited authority

to exercise personal jurisdiction over any nonresident who transacts any business in this State." *Id.* The court continued: "Of course, because this statutory language would expand the personal jurisdiction of Georgia courts beyond that permitted by constitutional due process, we accordingly construe subsection (1) as reaching *only* 'to the maximum extent permitted by procedural due process.'" *Id.* (emphasis added).

Five years later, when it took up the task of interpreting subsection (1) in light of the supreme court's holding, the Eleventh Circuit held that "the Georgia long-arm statute *does not* grant courts in Georgia personal jurisdiction that is coextensive with procedural due process." *Diamond Crystal*, 593 F.3d at 1259 (emphasis added). The Eleventh Circuit recognized that the Georgia Supreme Court "intended to broaden the reach of the long-arm statute by stripping away certain limitations[] not expressly contained in the statute;" indeed, "[i]n adopting a literal construction of subsection (1), the supreme court appropriately discarded such artificial limitations on the statutory jurisdiction of courts in Georgia" as requiring "the nonresident defendant's presence in Georgia." *Id.* at 1260. The Eleventh Circuit further acknowledged that "the long-arm statute must be read literally." *Id.* at 1259. Nevertheless, the Eleventh Circuit made clear that, pursuant to *Innovative Clinical*, the long-arm statute "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." *Id.*

The Eleventh Circuit, like the supreme court, recognized that exercising personal jurisdiction pursuant to a broad reading of subsection (1) would violate due process and said that the supreme court "reasonably qualified its holding by adding the proviso that 'we

accordingly construe subsection (1) as reaching *only* to the maximum extent provided by procedural due process." *Id.* (emphasis supplied). That, however, did not end the inquiry:

> Lest there be any misunderstanding, this language does *not* mean that subsection (1)—or any provision of the long-arm statute—is coextensive with constitutional due process. Rather, this language makes clear that due process concerns may limit the full extent of the "transacts any business" prong. But this certainly does not mean that the two inquiries are one and the same.

*Id.* (emphasis supplied).

The Eleventh Circuit came to this conclusion by resolving an apparent contradiction in the supreme court's holding. According to the Eleventh Circuit, part of the supreme court's problem with pre-*Gust* cases, i.e., cases that read subsection (2) (torts committed in state) as limited only by due process, is that such a reading "rendered subsection (3) [(tortious injury caused by out-of-state conduct)] superfluous, thereby eviscerating legislative intent." *Id.* at 1262. However, if the supreme court really intended to read the limits of subsection (1) as coextensive with due process, the same problem would arise; i.e., if the limits of subsection (1), which is not limited to contract cases and is not limited to in-state conduct, were coextensive with due process, it would allow a plaintiff to avoid the carefully-worded limitations imposed by subsection (3). "It would defy common sense to suggest that the *Innovative Clinical* court intended to turn the 'transacts any business within Georgia' prong into the new stepping stone around subsection (3)." *Id.*

In short, *Diamond Crystal* makes clear that it is improper to pass over the long-arm statute analysis entirely and conflate it with, or collapse it into, the due process inquiry. Ironically, and perhaps discouragingly, the Georgia Court of Appeals has interpreted *Innovative Clinical* to do exactly what the Eleventh Circuit says it does not do, i.e., turn

long-arm statute analysis into a one-step due process question. *Vibratech, Inc. v. Frost*, 291 Ga.App. 133, 137, 661 S.E.2d 185, 188 (2008) (citing *Innovative Clinical* for the proposition that "the language of O.C.G.A. § 9-10-91(1) must be construed as reaching 'to the maximum extent permitted by procedural due process.'"). Of course, this Court is bound by the Eleventh Circuit's interpretation of *Innovative Clinical* and thus will apply the two step analysis.[5]

**D.  Analysis**

*1.  Whether Personal Jurisdiction is Appropriate Under the Georgia Long-Arm Statute*

To determine whether Georgia's long-arm statute affords jurisdiction, the Court must determine whether UPM transacted any business in Georgia. The answer, simply, is yes. According to the depositions of UPM's representative, UPM purchased warehousing and stevedoring services in Brunswick, Georgia, which UPM used to store paper products purchased from suppliers in Europe; UPM leases cars for its executives to use while in Georgia; UPM has a contract with AT&T to provide back-up servers in Georgia; and UPM sells paper to two customers, Unisource and Valpac, in Georgia. To paraphrase *Diamond Crystal*, "In total, [the Court] find[s] that [UPM] transacted business within Georgia. . . . Thus, personal jurisdiction is appropriate under O.C.G.A. § 9-10-91(1)." *Diamond Crystals*, 593 F.3d at 1266-67.

---

[5]  District courts, too, prior to *Diamond Crystal*, erred in their interpretation of *Innovative Clinical*. *See e.g., Global Payments Direct, Inc. v. American Bank of Commerce*, 2006 WL 269967 at *2 n.2 ("The Court recognizes that there is lingering doubt as to whether Georgia's long-arm statute has the same parameters as due process under the United States Constitution. However, the Georgia Supreme Court recently put the issue to rest in ruling that the scope of the long-arm statute is coterminous with due process, at least with respect to the 'transacts any business' subsection of O.C.G.A. § 9-10-91. *See Innovative Clinical*.").

2. *Whether Personal Jurisdiction Would be Appropriate under the Due Process Clause*

"Having found that Georgia's long-arm statute permits jurisdiction, [the Court] reach[es] the jurisdictional analysis under the Due Process Clause of the Fourteenth Amendment." *Id.* at 1267. "The Due Process Clause protects an individual's liberty interest in not being subject to binding judgments imposed by foreign sovereigns." *Id.* "The heart of this protection is fair warning—the Due Process Clause requires 'that the defendant's conduct and connection with the forum State [be] such that he should reasonably anticipate being hauled into court there.'" *Id.* "Therefore, states may exercise jurisdiction over only those who have established 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.*

There are two kinds of personal jurisdiction, specific and general. The Court will address each in turn.

"In specific jurisdiction cases, the 'fair warning requirement is satisfied if the defendant has purposefully directed his activities at the residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities.. . .' Put differently, the defendant must have 'purposefully availed' itself of the privilege of conducting activities—that is, purposefully establishing contacts—in the forum state and *there must be a significant nexus between those contacts and the litigation*." *Id.* (emphasis added). Here, there is no nexus between UPM's contacts and the litigation. UPM's only contacts are sales of finished paper products, the storage of finished paper products purchased from Europe, car rentals and back-up servers. None of these contacts has

anything to do with the negotiation of freight rates between Chicago and Grand Rapids, or even the purchase and transport of kaolin clay. Therefore, the Court cannot exercise specific personal jurisdiction over UPM.

"General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated." *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000). Importantly, and not surprisingly, "[t]he due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction." *Id.* "A state may constitutionally exercise personal 'general jurisdiction' over a foreign corporation if there are continuous and systematic general business contacts between the state and the foreign corporation." *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1057 (11th Cir. 1986).

In *Borg-Warner*, the Eleventh Circuit analyzed the Georgia defendant's contacts with the forum state, Missouri,[6] and concluded that the contacts were insufficient for the exercise of general personal jurisdiction. *Id.* In making its determination, the Eleventh Circuit considered the following:

> Lovett & Tharpe[, the defendant,] is a Georgia corporation; all the officers are residents of Georgia; and Lovett & Tharpe is not licensed nor has it ever been licensed in Missouri. There is no evidence that Lovett & Tharpe has an office or employees in Missouri, that they solicit business in Missouri, that they provide services or close sales in Missouri, that they sell products to Missouri purchasers, that they purchase products from Missouri sellers (other than in the instant transaction), or that they carry on any other activity there.

---

[6] *Borg-Warner* involved the plaintiff's attempt to domesticate in the Southern District of Georgia a judgment entered by default in Missouri.

*Id.* Here, UPM is a foreign corporation, it has not been licensed in Georgia, it does not have any officers or employees living in Georgia, it does not have an office or any salesperson in Georgia, and it does not purchase products from Georgia sellers. Its only contacts are sales of finished paper products to two corporations who have offices in Georgia, but it is not clear where those sales are negotiated and closed as UPM does not have any sales staff in Georgia. Additionally, UPM purchases a limited amount of warehousing space and stevedoring services in Brunswick, Georgia. However, these contacts are minimal and cannot be described as continuous and systematic general business contacts.[7] Therefore, the Court cannot exercise general personal jurisdiction over UPM.

Thus, UPM's contacts with Georgia are insufficient to subject it to either specific or general personal jurisdiction. To exercise such jurisdiction would surely violate UPM's rights under the Due Process Clause of the Fourteenth Amendment. Therefore, the Court must dismiss UPM from this litigation.

---

[7] Moreover, not all of these contacts with Georgia existed at the time of the events giving rise to the litigation, or of the filing of the Complaint. For instance, UPM had purchased warehousing and stevedoring services from the Georgia Ports Authority and SSA Cooper in 2005, 2006, and 2007, but had ceased using these services entirely by 2008.

## III. CONCLUSION

For the foregoing reasons, the Motion (Doc. 15) is **GRANTED** and BNSF's Third-Party Complaint is dismissed pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.

**SO ORDERED**, this 18th day of February, 2011.

_____
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

jch